# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

v.

KENYOUNTA HARVESTER, dob 09/29/75
CHANTEL LOCKETT, a.k.a. CHANTEL HARVESTER, d.o.b. 05/26/76
LARRY HARVESTER, d.o.b. 05/22/1981
ANGELA M. BISSONNETTE, d.o.b. 06/29/1973
MARQUIS DAVIS, d.o.b. 08/02/1979
JOSEPH JOHNSON, d.o.b.12/29/83
NINA SIMMONS, d.o.b. 12/24/1973
RAFAEL RODRIGUEZ, d.o.b. 7/1/79
RAUL AGUIRRE-ALVARADO, d.o.b. 12/21/69

## CRIMINAL COMPLAINT

CASE NUMBER:  $06 - 10m (AEG)$

I, James Krueger, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning sometime in 2002, and continuing through until the present time, in the City of Milwaukee, and in the State and Eastern District of Wisconsin, the above-named individuals did knowingly and intentionally conspire to possess with the intent to distribute and distribute in excess of 5 kilograms of cocaine, a Schedule II controlled substances, in violation of Title 21, United States Code, §§ 846, 841(a)(1), and 841(b), and Title 18, United States Code, § 2.

I further state that I am a Special Agent employed by the Drug Enforcement Administration, and that this complaint is based on the facts contained in the attached affidavit.

Continued on the attached sheet and made a part hereof: ✔ Yes

Sworn to before me and subscribed in my presence,

_____
Signature of Complainant

March  3  , 2006
Date

at   Milwaukee, Wisconsin
City and State

_____
Aaron E. Goodstein, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, James H. Krueger, being first duly sworn on oath depose and say that upon personal knowledge and upon information and belief:

## I.     AGENT EXPERTISE AND KNOWLEDGE

1.     I am a Special Agent with the Drug Enforcement Administration (DEA), presently assigned to the Milwaukee District Office, Chicago Field Division, United States Department of Justice (DOJ). As a Federal law enforcement officer, I have been employed by the DOJ for approximately 6 years, and have been a Special Agent with the DEA since 2000. In the course of my work, I investigate violations of federal narcotics laws and related violations, including federal firearms and money laundering offenses.

2.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses. This affidavit is based upon my personal knowledge and investigation, as well as information related to me directly or through reports by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. They include agents and officers from the DEA, as well as the Bureau of Alcohol, Tobacco and Firearms (ATF), the Federal Bureau of Investigation (FBI), the Milwaukee Police Department, and the Wisconsin Department of Justice Division of Criminal Investigation (DCI). This affidavit is also based upon information gained from interviews with cooperating citizen witnesses, informants, and defendants, whose reliability is

1

established separately herein. Based on my training and experience, I know the following:

a. That large-scale narcotics traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

b. That even though these assets are in names other than the narcotics traffickers', the narcotics traffickers actually own and continue to use these assets and exercise dominion and control over them;

c. That large-scale narcotics traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

d. That it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

e. That it is common for large-scale drug dealers to secret contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

2

f.    That in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or business and that there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of narcotics traffickers;

g.    That it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other locations over which they maintain dominion and control;

h.    That large-scale narcotics traffickers often utilize electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in items a, c, d, e and g above.

i.    That when drug traffickers amass large proceeds from the sale of drugs, that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize

3

the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

j.  That the sale of cocaine and other CDS generates large quantities of United States currency in small denominations (commonly referred to as "street money");

k.  That it is common for drug dealers to physically handle and count the "street money" after receiving it in exchange for the CDS, thereby leaving residue traces of CDS on the "street money". That law enforcement agencies own dogs which are trained to react to the scent of CDS and residue traces of CDS; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers;

l.  That it is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

m.  That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed, may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

4

n. That the Currency Transaction Report (CTR) (IRS Form 4789) which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

o. That in order to evade the filing of a CTR, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

p. That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

q. That cocaine and/or other CDS traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

r. That drug traffickers take or cause to be taken photographs of themselves;

5

their associates, their property and their product. That these traffickers
usually maintain these photographs in their possession;

s.  That the courts have recognized that unexplained wealth is probative
evidence of crimes motivated by greed, in particular, trafficking in
controlled substances;

t.  That drug traffickers commonly have in their possession, that is on their
person, at their residences and/or their businesses, firearms, including but
not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns
and other weapons. Said firearms are used to protect and secure a drug
trafficker's property. Such property may include but is not limited to
narcotics, jewelry, narcotics paraphernalia, books, records and United
States currency.

3.  This affidavit is based on my personal knowledge, information reported to me by
other federal, state, and local law enforcement officers during the course of their official duties,
all of whom I believe to be truthful and reliable. This affidavit is also based upon information
gained from interviews with citizen witnesses, informants, and defendants, whose reliability is
established separately herein.

4.  Throughout this affidavit, reference will be made to case agents. In this affidavit,
case agents means those federal, state, and local law enforcement officers who have directly
participated in this investigation, and with whom your affiant has had regular contact regarding
this investigation.

6

5.  This affidavit is submitted in support of an application for criminal complaints for violations of Title 21, United States Code, 841(a)(1), 841(b)(1)(A) and 846 (conspiracy to distribute 5 kilograms or more of cocaine) for the target individuals.

## INDIVIDUALS FOR WHOM A CRIMINAL COMPLAINT IS SOUGHT

6.  The target individuals are more particularly identified as:

a.  **Kenyounta Harvester**, a.k.a. **Kenny Fly**, **Fly**, **Big Cuz**, **Cuz**, **Bird Man** (B/M, DOB: 9/29/75) – The organizer/leader of the targeted drug trafficking conspiracy.

b.  **Chantel Lockett**, a.k.a. **Chantel Harvester**, **Tel** (B/F, DOB: 05/26/76) – Kenyounta Harvester's wife. She runs a day care front for the organization and holds many high-value assets purchased with drug proceeds.

c.  **Larry Harvester** (B/M, DOB: 05/22/81) – Kenyounta Harvester's brother. He makes drug deliveries at the direction of Harvester.

d.  **Angela M. Bissonnette**, a.k.a. **Bird** (B/F, DOB: 06/29/73) – Stores and distributes cocaine and marijuana for the organization. She is one of Kenyounta Harvester's girlfriends and one of his closest associates. She rents properties and vehicles, and purchases firearms for use by the organization.

e.  **Marquis D. Davis**, a.k.a. **Skinny Boy** (B/M, DOB: 8-2-79) – A cocaine distributer for Kenyounta Harvester's organization. He serves as a personal bodyguard and driver for Kenyounta Harvester and has been known to carry firearms.

7

f.     **Joseph L. Johnson** (B/M, DOB: 12-29-83) – a cocaine distributer for the organization. He was arrested on July 11, 2005, and charged with carrying a concealed weapon (case pending). He serves as a personal bodyguard and driver from Kenyounta Harvester.

g.     **Nina Simmons**, a.k.a. **Simone**, **Mone** (B/F, DOB: 12/24/73) – Transports and distributes kilograms of cocaine for the organization. She also serves as a facilitator for the organization and rents properties and vehicles for use by the organizational members. She is one of Kenyounta Harvester's girlfriends.

h.     **Rafael Rodriguez** (H/M, DOB: 7/1/79) - one of Kenyounta Harvester's cocaine suppliers. Arrested on March 2, 2006 in vehicle with more than $200,000.

i.     **Raul Aguirre-Alvarado** (H/M, DOB: 10/21/69) - one of Kenyounta Harvester's cocaine suppliers. Arrested with Rodriguez on March 2, 2006.

7.     As detailed below, there is probable cause to believe that the individuals identified above have committed violations of 21 U.S.C. §§ 841 and 846.

## BACKGROUND OF THE KENYOUNTA HARVESTER'S ORGANIZATION

8.     In September 2004, agents and officers from the Milwaukee High Intensity Drug Trafficking Area (HIDTA), the Milwaukee Police Department (MPD), the United States Department of Justice, Drug Enforcement Administration (DEA), and the Wisconsin Department of Justice, Division of Criminal Investigation (DCI), began to investigate the drug trafficking

8

activities of Kenyounta Harvester and his associates in the Milwaukee area. The investigation to date has determined that Kenyounta Harvester heads a tightly knit group consisting of his family members, his wife, his girlfriends, and close associates. The organization obtains multiple kilograms of cocaine and marijuana from unknown sources in Chicago, IL and elsewhere. Kenyounta Harvester arranges for the drugs to be transported to Milwaukee in both trap[2] vehicles and rental cars. Once in the Milwaukee area, Kenyounta Harvester arranges for the drugs to be broken down into smaller quantities and distributed through a close knit group of associates. Kenyounta Harvester and his associates frequently use cellular telephones to conduct their drug trafficking activities. Kenyounta Harvester also operates multiple hair salons and care centers as fronts for money laundering purposes.

### Informant Information

#### CI-1

9.      During September 2004, case agents developed a confidential informant (CI-1) who provided detailed information about current and past drug trafficking conducted by Kenyounta Harvester and his associates. I believe that the information CI-1 provided is truthful and reliable because the information is consistent with evidence obtained elsewhere in this investigation, and substantial portions of CI-1's information have been corroborated through independent investigation. CI-1 provided the following information regarding Kenyounta Harvester and his associates.

---

[2] A trap vehicle is an automobile with a secret compartment that is used to transport contraband such as drugs and weapons.

9

10.     CI-1 stated he has been actively involved in the distribution of cocaine in the
Milwaukee area for the past several years. CI-1 has multiple criminal convictions and is
presently charged with a state narcotics trafficking offense. CI-1 was under arrest and was
subjected to potential prosecution for new narcotics offenses. CI-1 stated since 2002, the
cocaine he distributed came from Kenyounta Harvester. CI-1 stated that to his knowledge,
Kenyounta Harvester purchased approximately 15 kilograms of cocaine per week and varied
amounts of marijuana ranging from 50 to several hundred pounds per week. CI-1's knowledge
was based upon his personal dealings with Kenyounta Harvester and other members of the
organization.

11.     CI-1 viewed a photograph and positively identified Kenyounta Harvester. CI-1
stated that in the past 16 years, he had achieved a certain status with Kenyounta Harvester. This
status allowed CI-1 to obtain 2-4 kilograms of cocaine per week from Harvester, which he would
turn around and sell in varying amounts.

12.     CI-1 stated Kenyounta Harvester would buy cocaine for $12,000—13,000 per
kilogram and marijuana at $250—300 per pound. He said Kenyounta Harvester would sell
these same amounts at up to double the price Kenyounta Harvester paid. This is based upon CI-
1's personal involvement with the organization and through conversations with Kenyounta
Harvester.

13.     CI-1 stated Kenyounta Harvester has an organization of numerous individuals
who work with him to import and distribute cocaine and marijuana in the Milwaukee area. CI-1
provided a list of associates and their role in the organization.

14.     CI-1 positively identified Chantel Lockett from a single photograph. Lockett is

10

Kenyounta Harvester's wife. She "runs" the Sally's Angels day care, located at 6826 W. Congress Avenue and pays rent for the building. She possesses various assets that were purchased with drug-dealing proceeds, including a BMW X5 sport-utility vehicle and a large diamond engagement/wedding ring.

15.     CI-1 positively identified Angela M. Bissonnette from a single photograph. Bissonnette holds and hides cocaine and marijuana for Kenyounta Harvester. She is a long-time friend of the Harvester family. Her nickname is "Bird."

16.     CI-1 positively identified Larry Harvester from a single photograph. Larry Harvester is Kenyounta Harvester's younger brother. Larry Harvester makes drug deliveries at the direction of Kenyounta Harvester.

17.     CI-1 positively identified Joy M. Thomas from a single photograph. Thomas is Larry Harvester's girlfriend. She holds and hides drugs as needed. She rents apartments in her name for others to use.

18.     CI-1 positively identified Kevin L. Johnson from a single photograph. Johnson's nicknames are "Kev" and "KJ." Johnson is a close friend and drug dealing associate of Kenyounta Harvester. Johnson lives in the 2300 block of N. 6th Street.

19.     CI-1 stated that Kenyounta Harvester lives in the "suburbs", but does not know the address.[3] Kenyounta Harvester lives with his wife, Chantel Lockett, who also goes by Chantel Harvester. CI-1 said that Kenyounta Harvester operates two businesses that serve as fronts to disguise the money Kenyounta Harvester earns from drug dealing. These businesses are

---

[3] Brookfield, where Kenyounta Harvester lives, is a located in Waukesha County, just west of Milwaukee.

11

Marell's Barber Shop, at 7251 W. Appleton Avenue, and "Sally's Angels" day care center at
6826 W. Congress Avenue.

20.     CI-1 stated both of these businesses do little, if any, legitimate business. CI-1 said
that the barbershop may only get a couple customers per day, and said that of these few
customers, many are drug-dealing associates that get their hair cut.

21.     CI-1 stated that Kenyounta Harvester has received SSI payments from the federal
government for mental/physical conditions that he "fakes."

22.     CI-1 stated that Marell's Barber Shop is frequently used as a meeting place for
Kenyounta Harvester's workers who transport and deliver drugs as well as his customers. CI-1
said that narcotics are not kept at the barbershop, but may be brought in for a particular
transaction.

23.     In October 2004, CI-1 advised agents that Kenyounta Harvester had recently
fronted an half kilogram of powder cocaine to a woman named Toya Olds, who is also known as
"Sweet." CI-1 stated Kenyounta Harvester forced the cocaine on Olds because he was having
trouble moving enough cocaine. Kenyounta Harvester took an extraordinary risk by doing this
because Olds had not proven to be a reliable worker. After being fronted the cocaine, Olds told
Kenyounta Harvester she had been robbed by her girlfriend's brother. Since money was owed to
Kenyounta Harvester, he took Olds's green Buick Riviera, a big-screen television, and some
other property belonging to Olds. CI-1 stated the value of that cocaine varied from $10,000 to
$13,000. CI-1 said he had heard rumors that Kenyounta Harvester might try to carry out, or hire
out, an act of revenge against the man that supposedly robbed Olds. CI-1 stated that in reality,

12

Olds had tried selling the half kilogram of cocaine to a few people who cheated her, and that the robbery never actually happened.

24.     CI-1 stated that on several occasions when Kenyounta Harvester was conducting drug deals, he would call a female named "Simone or "Moni." This female drive over in a rental car and drop off drugs to Harvester. Harvester would then hold everyone in place for 30 minutes to an hour so that no one could follow "Simone." CI-1 said that Kenyounta Harvester keeps "Simone's" identity a secret because she has the "keys to his stash." CI-1 positively identified Nina Simmons from a single photograph as "Simone".

25.     CI-1 reported that in the summer of 2004, Kenyounta Harvester and Lance Reed were shot outside of the "Rock" tavern on W. Appleton Avenue. Kenyounta Harvester personally told CI-1 about the shooting.

26.     CI-1 reported that in August 2004, the day after Kenyounta Harvester was shot, Harvester met with "Marcus" (possible last name of Ashley). CI-1 describes "Marcus" as a "square" (Based upon training and experience, Affiant knows that this means someone with a legitimate job who does not hustle or deal drugs for a living). Marcus works at the "Sophisticated Man" on Wisconsin Avenue in downtown Milwaukee. "Marcus" introduced Kenyounta Harvester to a white male. Harvester eventually bought guns from the white male, in response to the shooting. CI-1 said the guns appeared to be an Uzi-type semi-automatic firearm, a SKS/AK47-type assault rifle, and a .45 caliber pistol with a laser sight. All three guns appeared to be brand new as they were very clean and in their original boxes. Kenyounta Harvester bought the Uzi and SKS for $1,500, and then bought the .45 caliber pistol later in the week. CI-1 stated he was present during the actual purchase of the firearms.

13

27.     CI-1 positively identified William L. Turner from a single photograph. Turner is known as "Ween" and is a kilogram-level customer of Kenyounta Harvester. Turner is involved in the Ebony II and Ebony III barbershops, located at N. 35ᵗʰ and W. Townsend Streets, and the 7500 block W. Appleton Avenue, respectively.

CI-2

28.     During July 2005, case agents developed a confidential informant (CI-2) who provided detailed information about current and past drug trafficking conducted by Kenyounta Harvester and his associates. I believe that the information CI-2 provided is truthful and reliable because the information is consistent with evidence obtained elsewhere in this investigation, and substantial portions of CI-2's information have been corroborated through independent investigation. CI-2 provided the following information regarding Kenyounta Harvester and his associates.

29.     CI-2 positively identified Anthony Robinson, also known as Anthony Yateman, from a single photograph. He lives near N. 36ᵗʰ St./W. Villard Avenue, and operates a recording studio in a house in this neighborhood. Investigation later determined that Yateman lived at 5248 N. 36ᵗʰ Street. Yateman's girlfriend is Latoya Edwards. Yateman keeps a larger amount of drugs at Edwards's house as a source of re-supply for the N. 36ᵗʰ house. CI-2 did not know Edwards's address, but said that her mother owns the Yateman's N. 36ᵗʰ Street house.

30.     CI-2 positively identified Christopher Paskel from a single photograph. CI-2 has observed Yateman and Paskel being supplied with cocaine by Kenyounta Harvester. CI-2 also knows that Harvester will also sometimes have Joseph Johnson deliver the drugs to Yateman.

31.     CI-2 has observed Kenyounta Harvester carrying and handling a .40 caliber pistol

14

at the N. 36th Street house during the summer of 2005. Harvester typically delivers drugs to this house after 2 p.m. Harvester also goes to the N. 36th Street house to socialize, drink beer, and roll dice with Yateman, Paskel, and others. CI-2 has observed Harvester driving a charcoal or dark gray colored Dodge Magnum.

32.    On August 17, 2005, CI-2 told Affiant about a "recording studio" located at 5514 W. Lisbon Avenue, Milwaukee, WI, that was being used by Christopher Paskel to distribute drugs for Kenyounta Harvester.

33.    On August 23, 2005, Officers responded to a report of shots fired into the residence at 5248 N. 36th Street, Milwaukee, Wisconsin. This is the location was identified by CI-2 as being used by Christopher Paskel, Anthony Yateman, and Kenyounta Harvester to distribute drugs. During the course of investigation, police recovered a 12-gauge shotgun, ammunition, a box for a 9 mm pistol, and marijuana. Yateman was not on scene. He was later arrested, but no charges were issued against Yateman.

CI-3

34.    During July 2003, Chicago case agents developed a confidential informant (CI-3) who provided detailed information to both Chicago case agents and Milwaukee case agents about current and past drug trafficking conducted by Kenyounta Harvester and his associates. CI-3 is an illegal immigrant. DEA has intervened on CI-3's behalf with the Bureau of Immigration and Customs Enforcement to obtain temporary legal status for CI-3 so that CI-3 could continue to assist law enforcement. CI-3 is being paid by law enforcement personnel for his cooperation. I believe that the information CI-3 provided is truthful and reliable because the information is consistent with evidence obtained elsewhere in this investigation, and substantial

15

portions of CI-3's information have been corroborated through independent investigation. CI-3 provided the following information regarding Kenyounta Harvester and his associates.

35. On July 29, 2003, Agents of the DEA/HIDTA Group 23 in Chicago, Illinois were called to assist with the investigation of a triple-homicide that occurred at 3515 W. Belden, Chicago, IL. One of the people killed was Edgar D. Juarez, aka "Danny." The agents developed CI-3, who identified "Danny" as a cocaine distributor in the Chicago area. CI-3 admited to being an employee for "Danny" and gave information on a Milwaukee, WI cocaine customer known to him only as "Kim". In 2005, CI-3 identified "Kim" as Kenyounta Harvester. During DEA/HIDTA Group 23's investigation they only knew Harvester as "Kim." The agents never contacted Milwaukee law enforcement to share information about the case.

36. On August 7, 2003, HIDTA Group 23 agents brought CI-3 to 7837 W. Silver Spring Drive, Apt. 101, Milwaukee, WI, where CI-3 collected $10,000 in drug debt from Kenyounta Harvester. CI-3 discussed the death of "Danny" and Harvester said he would now need a new supplier of cocaine. CI-3 said he could introduce Harvester to a new supplier in the near future. At the time, agents attempted to identify Harvester through surveillance, but were unsuccessful because Harvester conducted a number of U-turns and constantly looked around.

37. On August 19, 2003, HIDTA Group 23 agents arranged for CI-3 and an undercover agent posing as a drug dealer to meet with Kenyounta Harvester in Skokie, IL. Harvester arrived for the meeting in a vehicle bearing Wisconsin plates 222FEC, driven by an unknown female. A records check of the license plate showed it listed to Nina Simmons, 6747 N. 75th Street. Harvester was upset by the way the undercover officer acted and told CI-3 that Harvester wanted to shoot the undercover outside in the parking lot.

38. Further negotiations were conducted via telephone in August 2003 for the

16

purpose of arranging a "reversal" whereby Kenyounta Harvester was to bring money for a purchase of 30 kilograms of cocaine. Two telephone numbers used by Kenyounta Harvester had listed subscribers of Elenzo Harvester and Chantel Lockett.

39.　　On October 14, 2003, HIDTA Group 23 agents received information from CI-3 that Kenyounta Harvester had obtained a new source of cocaine and marijuana named "Pedro." CI-3 informed agents that he/she had previously provided Harvester with a trap vehicle, i.e., a vehicle with a hidden compartment. Harvester expressed interest in purchasing traps for additional vehicles as well as for a barbershop. Shortly, thereafter, the Chicago investigation was closed.

40.　　In September 2005, Milwaukee case agents met with CI-3 after learning of CI-3's existence from Chicago HIDTA agents. CI-3 positively identified Kenyounta Harvester and Angela Bissonnette from single photographs. CI-3 explained that CI-3 had first met Kenyounta Harvester in Milwaukee about two years ago, and was introduced by a drug dealer named "Danny", for whom CI-3 worked. Danny stole Harvester as a customer from another drug dealer. Danny was murdered in Chicago in 2003 in a triple-murder, which appears to be related to Danny's narcotics trafficking. CI-3 admitted making about 20 trips to Milwaukee, of which four were to deliver cocaine. The others were to collect money or to meet with Harvester. Harvester refused to meet with CI-3 on numerous occasions, making many of the trips "useless". There were at least seven occasions when Harvester did not have the money ready and paid later. CI-3 only knows of Kenyounta Harvester coming to Chicago on one occasion, and was always reluctant to get drugs anywhere outside Milwaukee. Harvester generally paid about $18,000 to Danny for each kilogram of cocaine.

41.　　CI-3 installed trap compartments in two automobiles for Kenyounta Harvester.

17

One vehicle into which CI-3 installed a trap compartment was a Chevrolet Monte Carlo (seized by Milwaukee Police on April 20, 2004) and the other was a Ford Taurus. Harvester called CI-3 up to Milwaukee once to fix the trap in the Taurus when it got stuck. Harvester had a .40 caliber pistol inside the trap when CI-3 repaired it. CI-3 built a space for Harvester to store a watch in the trap. Harvester showed CI-3 a diamond-encrusted watch, for which Harvester said he paid $80,000 or $90,000.

42.     The trap CI-3 installed in Harvester's black Monte Carlo was in the front of the center console. CI-3 recalled it that opened and closed by activating the rear defroster, emergency brake, and either the windows or mirrors. Harvester paid CI-3 $700 and a "starter pistol" (Based upon training and experience, Affiant knows this to be a gun that only shoots blanks), for installing this trap compartment, which CI-3 turned over to a DEA agent in Chicago.

43.     In 2003, CI-3 visited a house maintained by Kenyounta Harvester at 7024/7026 W. Acacia Street; an apartment at Silver Spring and Fond Du Lac Avenues; and two barber-shops, including Kenyounta Harvester's barbershop on W. Appleton Avenue. Your affiant discovered that the utilities listed at the residence located at 7026 are in the name of Angela Bissonette. When CI-3 was at Harvester's house on Acacia, Harvester showed CI-3 an automatic weapon that he said was "Government issue." CI-3 also said there were two cameras outside on the house on Acacia which could observe approaching individuals.

44.     When CI-3 traveled to Milwaukee, it was always to Kenyounta Harvester's apartment at Silver Spring at Fond Du Lac Avenues. When CI-3 arrived to pick up the money, Harvester did not have the money at the apartment. Harvester would call Angela Bissonnette, who would bring the money over. CI-3 noted only one occasion where Harvester had the money – about $280,000 – at the apartment.

18

45.     CI-3 stated that he was personally involved in four drug deliveries to Kenyounta Harvester in 2003. The first occurred at occurred at Kenyounta Harvester's apartment at Silver Spring and Fond Du Lac Avenues. CI-3 accompanied "Danny." "Danny" supplied Harvester with ten kilograms of cocaine, which was transported to Milwaukee in a trap car (a Jeep – possibly Wrangler). CI-3 could not recall if Harvester immediately paid for the cocaine during that first deal or if he paid later. During the first deal, "Danny" told Harvester that CI-3 would be the person with whom Harvester would conduct transactions in the future. Harvester made his first request for CI-3 to install a trap compartment at his barbershop.

46.     CI-3 recalled making an additional three deliveries to Kenyounta Harvester during a three to four month period in 2003. The other deliveries were for 30 kilograms, 20 kilograms and 25 kilograms of cocaine. During that same period, CI-3 recalls receiving a minimum of $1,000,000 from Harvester in payment for the cocaine. During this time frame "Danny" was distributing 300 kilograms of cocaine per month.

47.     CI-3 also had personal notes, which he used to "cover his ass" with "Danny", regarding how many kilos he delivered and who he delivered them to, including Kenyounta Harvester. These notes were provided to case agents, but CI-3 had trouble deciphering them.

48.     Prior to and immediately following the death of Edgar D. Juarez, a.k.a. Danny, Kenyounta Harvester's cocaine source was "Pedro", who CI-3 described as a chunky Mexican guy in a pickup truck and runs an unknown type of store near the Illinois-Indiana border.

CI-4

49.     During February 2005, case agents developed a confidential informant (CI-4) who provided detailed information to case agents about current and past drug trafficking conducted by Kenyounta Harvester and his associates. CI-4 has a pending criminal case in the

19

Milwaukee County Circuit Court. I believe that the information CI-4 provided is truthful and reliable because the information is consistent with evidence obtained elsewhere in this investigation, and substantial portions of CI-4's information have been corroborated through independent investigation. CI-4 provided the following information regarding Kenyounta Harvester and his associates.

50.     CI-4 first met Kenyounta Harvester three to four years ago. CI-4 bought cocaine from Kenyounta Harvester on approximately four occasions in 2002 and 2003. CI-4 bought one kilogram of cocaine for $23,000. On three other occasions, CI-4 purchased nine ounces (1/4 kilogram) of cocaine for $5,800.

51.     CI-4 would meet Kenyounta Harvester, and negotiate a sale price. Harvester would then make a telephone call, and CI-4 would meet a female to complete the deal. More than one female conducted these transactions. CI-4 would meet the female and give her money; she would leave and return with the cocaine. CI-4 said that the female would be followed by another vehicle that appeared to be watching her.

52.     CI-4 said Harvester and his people always used rental vehicles. Harvester is usually accompanied by two or three vehicles loaded with his men, who have guns and protect Harvester. Harvester brags about being worth millions of dollars and owning jewelry and property, including in Atlanta, GA.

53.     According to CI-4, Harvester employs a private investigator to find out about people before dealing with them. This includes whether a person has been arrested and has pending cases, in order to prevent someone from cooperating against him. Harvester also conducts "Internet" checks on people, to check pending cases, confirm identities and residences, and to prevent informants or others from infiltrating his organization or setting him up. It should

20

be noted that, in October 2004, Kenyounta Harvester and Attorney Martin Kohler met with Milwaukee County Assistant District Attorney John Chisholm, Affiant, and Affiant's partner. When ADA Chisholm introduced himself, Harvester replied, "I know who you are; I checked you out on the Internet."

CI-5

54.    In July 2003, Special Agent Jay Novak of the Wisconsin Department of Justice, Division of Criminal Investigation debriefed a confidential informant (CI-5) who provided detailed information to case agents about current and past drug trafficking conducted by Kenyounta Harvester and his associates. CI-5 had a pending criminal case at the time the information was provided. CI-5 has now been sentenced. I believe that the information CI-5 provided is truthful and reliable because the information is consistent with evidence obtained elsewhere in this investigation, and substantial portions of CI-5's information have been corroborated through independent investigation. CI-5 provided the following information regarding Kenyounta Harvester and his associates.

55.    CI-5 said he/she delivered a total of 17 to 20 kilograms of cocaine at an average price of $21,500 to $22,000 per kilogram to Kenyounta Harvester starting around August-September 2002 to July 2003. (Affiant knows based upon training and experience that large scale narcotics traffickers often maintain multiple sources). CI-5 supplied approximately 12 kilograms of cocaine every two weeks, with the largest single purchase being 3 kilograms. These deliveries typically took place at a parking lot near S. 35th Street & W. National Avenue in Milwaukee. CI-5 observed "Ken" driving a black Chevrolet Monte Carlo or Impala.

CI-6

56.    In December 2005, case agents developed a confidential informant (CI-6) who

21

provided detailed information to case agents about current and past drug trafficking conducted by Kenyounta Harvester and his associates. CI-6 has a pending criminal case in State court. I believe that the information CI-6 provided is truthful and reliable because the information is consistent with evidence obtained elsewhere in this investigation, and substantial portions of CI-6's information have been corroborated through independent investigation. CI-6 provided the following information regarding Kenyounta Harvester and his associates.

57.     CI-6 positively identified Kenyounta Harvester from a single photograph. CI-6 met Harvester in 1990, but did not have regular contact with him until early 2003. Harvester was introduced to CI-6 as a potential source of supply of cocaine. In March 2003, Harvester supplied CI-6 with an ½ ounce quantity of crack cocaine for $375. Less than a week later, Harvester supplied CI-6 with a full ounce for $700. In April 2003, Harvester supplied CI-6 with 4 ½ ounces of crack cocaine for $2,850, which CI-6 said was a good price at the time. CI-6 then continued to purchase 4 ½ ounce quantities of crack cocaine at least once a week, but usually twice per week. After one month, Harvester raised the price for each 4 ½ ounce quantity to $3,400.

58.     Since April 2003, Harvester has supplied CI-6 with "at least 30" 4 ½ ounce quantities of crack cocaine. All transactions were done face-to-face between CI-6 and Harvester, because CI-6 only wanted to deal with the top guy in the organization. CI-6 explained that dealing with subordinates only increases costs of reduced drug quantity, as extra players take their cut.

59.     CI-6 stated that later in their business relationship, Kenyounta Harvester became

22

more security conscious. On one specific instance, CI-6 recalled Harvester giving CI-6 step-by-step driving directions to a meet location via telephone. Harvester directed CI-6 to drive in circles until it became apparent to CI-6 that Harvester was watching CI-6's movements the whole time. CI-6 says Harvester did this to guard against both a police set-up and robberies.

60.     CI-6 had no direct information about Kenyounta Harvester's source of supply, other than that Harvester has said the supplier was a Cuban man. Harvester also said that he used a pair of rental cars to go "down" [presumably somewhere south of Milwaukee] to get the drugs. On the return trip to Milwaukee, Harvester would have someone else drive the car with the drugs in it while he followed in a "clean" car.

61.     On several occasions, Kenyounta Harvester attempted to recruit CI-6 to work directly for him on several occasions. Harvester invited CI-6 to go on trips to New York City, Atlanta, and Miami, which CI-6 declined.

62.     CI-6 positively identified, among others, Angela Bissonnette from a single photograph as an associate of Kenyounta Harvester.

63.     CI-6 had made at least two purchases of 4 ½ ounces of crack cocaine from Kenyounta Harvester inside Marell's Barber Shop. On both of these occasions, other narcotics customers were waiting in the public area of the shop. As customers arrived, they had to ring the door buzzer for a locked, outer door in order to be admitted into the shop. Once inside, customers waited with Kenyounta Harvester. After all the customers had arrived, a woman came in with duffel bag full of cocaine and marijuana. Harvester would then take each individual customer into a private room to make the drug sale.

64.     CI-6 stated that Paskel and Yateman hung out at Kenyounta Harvester's drug

23

house located near the north end of the 5200 block of N. 36th Street. Harvester usually supplied CI-6 with cocaine at this house. The house had recording equipment inside, which CI-6 said Yateman – an aspiring rapper – would use. Paskel would frequently attempt to sell cocaine to CI-6, but CI-6 refused to deal with a middleman.

CI-7

65.     In November 2005, case agents developed a confidential informant (CI-7) who provided detailed information to case agents about current and past drug trafficking conducted by Kenyounta Harvester and his associates. CI-7 has a pending criminal case in State court. I believe that the information CI-7 provided is truthful and reliable because the information is consistent with evidence obtained elsewhere in this investigation, and substantial portions of CI-7's information have been corroborated through independent investigation. CI-7 provided the following information regarding Kenyounta Harvester and his associates.

66.     CI-7 positively identified Kenyounta Harvester, Larry Harvester, and Angela Bissonnette from single photographs.

67.     CI-7 met Kenyounta Harvester, a.k.a. "Fly", in 2003. CI-7 met Harvester through Anthony Yateman, a.k.a. Anthony Robinson, "Fo-P", or "4-P". Yateman has a house/recording studio at N. 36th Street and W. Villard Avenue. CI-7 did not conduct business with Harvester at first because CI-7 had another source for cocaine. CI-7 wanted to maintain a relationship with Harvester, however, in case he ever needed a new cocaine supplier.

68.     CI-7 was stopped in another state during a drug run for another organization. During the stop police seized $53,000 from CI-7's vehicle. When CI-7 returned to Wisconsin, CI-7 called Kenyounta Harvester and met him at a house N. 86th Street and W. Good Hope Road.

24

Larry Harvester patted CI-7 down, telling CI-7 that he did not care if CI-7 had any pistols, but wanted to make sure that CI-7 was not wearing a wire. CI-7 told Kenyounta Harvester about the seizure. Kenyounta Harvester told CI-7 "you could have bought five birds for that much money." (Based upon training and experience, Affiant knows "bird" to be a common street slang for a kilogram of narcotics, usually a kilogram of cocaine.) Kenyounta Harvester then said to someone, "bring a movie." (Based upon training and experience Affiant knows "movie" to be another common street slang for a kilogram of cocaine.) Angela Bissonnette then brought a kilogram of cocaine. CI-7 believes this display was meant to demonstrate how easy Harvester could supply him.

69.     On three occasions, Yateman supplied CI-7 with 4 ½ ounces of cocaine for $2,700. CI-7 also observed Yateman supply "Rich Buck" (known by Affiant to be the street name of Calvin Hayes) with nine ounces of cocaine. CI-7 stayed at Yateman's house on N. 36th Street on several occasions and participated in the drug dealing activities at that location. CI-7 bought on three occasions. One of these occasions, CI-7 observed someone else getting supplied with nine ounces of cocaine.

70.     Kenyounta Harvester supplied CI-7 with cocaine on a consignment basis on several occasions (based upon training and experience, Affiant knows that the term "fronting" is commonly used to indicated the provision of drugs on a consignment basis) through Yateman. When CI-7 paid Harvester for the drugs fronted to CI-7, Harvester would immediately push an additional amount of cocaine on CI-7. This kept CI-7 in debt to Harvester and kept CI-7 dealing with him.

71.     For example, Yateman supplied CI-7 with 4 ½ ounce quantities of cocaine on five

occasions. CI-7 then owed Yateman $11,000. After CI-7 paid $9,000, Yateman supplied CI-7 with a half-kilogram of cocaine for $11,000.

72.     After a while, Kenyounta Harvester called CI-7 directly and said CI-7 did not have to go through Yateman anymore and could instead be supplied directly by Harvester. In late September or October 2003, Harvester supplied CI-7 with a half-kilogram of cocaine for $11,000. Yateman was angry that Harvester had cut him out of the transaction. From September 2004 until start of summer 2005, Harvester then supplied CI-7 about one kilogram of cocaine every two weeks. CI-7 estimated that Harvester supplied CI-7 with more than ten kilograms of cocaine.

73.     Kenyounta Harvester supplied CI-7 regularly until the start of the summer of 2005. At that time, Harvester's cocaine was "re-rock," (Based upon training and experience knows that this means the cocaine was mixed with a cutting agent to expand the volume of cocaine, but also reduced its purity and quality), and "wasn't right." Harvester kept pressuring CI-7 to buy cocaine, but CI-7 stopped dealing with Harvester in the late fall of 2005, and resumed dealing with a supplier in Texas.

74.     CI-7 has seen Kenyounta Harvester with approximately one million dollars in cash. CI-7 helped Kenyounta Harvester, Yateman and others in a money counting session that lasted all night at Yateman's house on N. 36th Street.

75.     CI-7 is familiar with several locations that Kenyounta Harvester used or uses for drug dealing activities, including apartments or houses on N. Presidio Lane; N. 86th Street and W. Good Hope Road; N. 85th Street and W. Capitol Drive; and N. Servite Drive behind a Menard's.

26

76.    CI-7 reported that Kenyounta Harvester also had a house on N. 50th Street that got burglarized. $8,000 and two ounces of cocaine were taken.

77.    Joseph Johnson, among others, used the residence on N. Servite Drive. CI-7 reported that Kenyounta Harvester shot at Yateman's house on N. 36th Street. A review of MPD records shows that this shooting occurred on August 23, 2005. No one was arrested in connection with the shooting.

78.    CI-7 says Kenyounta Harvester is no longer dealing drugs hand-to-hand himself. He is the "moneyman" and has other people physically handling the drugs for him. CI-7 believes Harvester has millions of dollars. CI-7 has seen Harvester with large amounts of U.S. currency, and knows through conversations with Harvester that other individuals handle the drugs in the organization.

CI-8

79.    In November 2005, case agents developed a confidential informant (CI-8) who provided detailed information to case agents about current and past drug trafficking conducted by Kenyounta Harvester and his associates. CI-8 has pled guilty in a federal narcotics conspiracy case and is cooperating with law enforcement. I believe that the information CI-8 provided is truthful and reliable because the information is consistent with evidence obtained elsewhere in this investigation, and substantial portions of CI-8's information have been corroborated through independent investigation. CI-8 provided the following information regarding Kenyounta Harvester and his associates.

80.    CI-8 has known CI-1 for most of his life. CI-8 has known Kenyounta Harvester since February 2003. CI-8 positively identified, among others, Kenyounta Harvester, Larry Harvester, and Judale Malone from single photographs. CI-8 met Kenyounta Harvester, who he

27

also knows as "Fly" or "Birdman," socially. CI-1 supplied CI-8 with cocaine, usually 4 ½ to 6 ounces of cocaine at a time. CI-8 knows from conversations and observations that Kenyounta Harvester supplied CI-1 at least through September 2004. Harvester supplied CI-1 with between ½ to one kilogram of cocaine per week. On average, Harvester supplied C1-1 with five kilograms per month from 2002 through 2004.

81.     CI-8 occasionally helped CI-1 distribute Harvester's cocaine and received a small amount of CI-1's profit.

82.     CI-8 has been to Kenyounta Harvester's barbershop on Appleton Avenue on a few occasions. CI-8 went with CI-1 to pick up drugs there on one occasion. CI-1 was able to enter using a key and the code to the alarm, and picked up four to five ounces of cocaine hidden under a towel inside.

83.     CI-8 spoke to Kenyounta Harvester on the phone on one occasion, when Harvester was upset with CI-1. Harvester asked about selling directly to CI-8, without CI-1 as the middleman. Because CI-1 got back in Harvester's good graces, no direct transactions ever took place.

84.     CI-1started out selling 4-5 kilos of cocaine a month, just to impress Kenyounta Harvester. CI-1 then started selling 1-2 kilos per month, which he would mix with a cutting agent to make more money. Harvester did not like that and often argued with CI-1 about it.

85.     After CI-1 was arrested in September 2004, Kenyounta Harvester refused to deal with him and advised everyone in his organization to avoid him.

86.     CI-8 once bought two ounces of crack cocaine from Judale Malone, who said he received it from Kenyounta Harvester.

28

87.     In January 2006, case agents developed a confidential informant (CI-10) who provided detailed information to case agents about current and past drug trafficking conducted by Kenyounta Harvester and his associates. CI-10 had previously entered a cooperation and plea agreement in an unrelated federal narcotics case. I believe that the information CI-10 provided is truthful and reliable because the information is consistent with evidence obtained elsewhere in this investigation, and substantial portions of CI-10's information have been corroborated through independent investigation. Additionally, information provided by CI-10 in unrelated investigations has proven truthful and reliable. CI-10 provided the following information regarding Kenyounta Harvester and his associates.

88.     CI-10 positively identified Kenyounta Harvester and Brandon Bennett from single photographs. CI-10 stated that CI-10 first met Harvester in 2001 and did 3-4 drug transactions with him; each deal for between 4 ½ to 9 ounces of powder cocaine.

89.     CI-10 met up with Harvester again in the fall of 2004. CI-10 purchased an ounce of cocaine from Harvester, took it home and cooked it into crack cocaine, and then promptly ordered an additional ½ kilogram of cocaine from Harvester.

90.     CI-10 conducted three additional purchases directly from Harvester, each for a kilogram of cocaine. Harvester supplied CI-10 with seven additional kilograms between November 2004 and January 2005. On each of these occasions, CI-10 called Harvester. Harvester then directed CI-10 to pick up the cocaine from Brandon Bennett at an apartment

---

[4] CI-9 is not being relied upon in this affidavit.

building in the area of N. 92nd Street and W. Monrovia. During surveillance in 2005 and 2006, agents have observed vehicles associated with Harvester making brief stops at this location.

91.    Harvester once showed CI-10 a Jacobs watch encrusted with diamonds. Harvester bragged that the watch cost more than $100,000. Agents subsequently seized this watch from 7456 N. 86th Street.

92.    CI-10 reported that Harvester always carried a handgun during meetings, and that Harvester was excessively security conscious. Harvester told CI-10 that he employed private detectives to do checks on people to ensure that he would not get robbed or set up by the police.

### Other Evidence

93.    On April 5, 2004, Angela Bissonnette was arrested for possession with intent to deliver marijuana and keeper of a drug house. Officers conducted a consent search of the house, located at 7456 N. 86th Street, and recovered over 77 pounds of marijuana, a loaded .40 caliber pistol, $975 in cash, a vacuum sealer and bags, two cellular phones, a digital scale, security cameras, personal papers in the name of Kenyounta Harvester and Angela Bissonnette, Kenyounta Harvester's Wisconsin State I.D. card and Bank One Visa card, Kenyounta Harvester's business cards ("Kenny Fly" and a blank line next to the "cell #"), a diamond encrusted Jacobs men's watch worth over $100,000, and photographs. Bissonnette waived her rights and made a statement admitting possession of the marijuana and claiming that she had purchased the .40 caliber pistol from a gun show. She also admitted buying two other firearms from a gun store in Milwaukee County, but claimed that these firearms had been stolen. She admitted that she never reported the theft of these firearms to the police.

94.    After her arrest, Bissonnette was held in the Milwaukee County jail. Bissonnette

30

made a telephone call to Chantel Lockett, aka Chantel Harvester, which was recorded as a matter of course.

95. During the call, Kenyounta Harvester got on the line and spoke with Bissonnette. Bissonnette apologized to Harvester for the incident and admitted that she gave consent to the police. She assured Kenyounta Harvester that she had not told the police anything about the "family tree." [It is reasonable to assume that this referred to other close associates of Kenyounta Harvester.] Kenyounta Harvester complimented Bissonnette by describing her conduct as "gangsta." Kenyounta Harvester assured Bissonnette that he would take care of her, even if it costs "50,000."

96. Bissonnette subsequently pled guilty to a charge of being a keeper of a drug house. She received a suspended prison term and is presently on supervised release.

97. Kenyounta Harvester was also charged in the case, and his case remains pending.

98. On April 5, 2004, police received consent to search 8573 N. 106th Street, from Chantel Lockett. Chantel claimed she lived at the house. Inside, officers recovered $41,844, a small quantity of marijuana, nine .45 caliber cartridges, a bullet proof vest, a cellular telephone, utility bills for the house and tax records in the name of Chantell Lockett, and records that indicated that "Chantel Lockett" paid rent for 7251 W. Appleton Avenue.

99. During the same recorded jail conversation with Bissonnette referenced above, Chantel Harvester indicated that the police had taken $40,000 from their apartment on 106th Street.

100. On April 20, 2004, Kenyounta Harvester was arrested during a traffic stop for

31

unlawful possession of a firearm by a convicted felon. Harvester was wearing a men's watch worth over $25,000. He was arrested in front of 8541 N. 106th Street. Harvester was the sole occupant of a black Monte Carlo. During the search incident to arrest, officers discovered that the passenger side air bag had been removed and replaced by a mechanically operated trap compartment. This compartment was installed by CI-3. The case remains pending.

101.    On May 25, 2004, Kevin Johnson was arrested for possession with intent to deliver cocaine base (less than 15 grams). He was charged by the State and pled guilty on October 5, 2005. On February 16, 2006, he was sentenced to 15 years, with 7 and ½ years of initial confinement.

102.    On July 6, 2004, police monitored the funeral services for Kenyounta Harvester's mother, Thelma Harvester. Police seized a program for the funeral which contained substantial information about the Harvester family. CI-1 told investigators that Kenyounta Harvester spent more than $80,000 on the funeral which included a gold-plated horse-drawn hearse for his mother's casket.

103.    On August 7, 2004, Kenyounta Harvester and Lance Reed were shot outside a tavern on the north side of Milwaukee. They drove themselves to a hospital. The hospital reported the shooting to the police. During the subsequent investigation, officers discovered a 9 mm pistol was found in Reed's vehicle. An ATF gun trace revealed that Reed was the original purchaser of the pistol.

104.    On October 11, 2004, Toya Olds reported to police that she had been robbed at

32

gunpoint of $1,500 by Charlie Body.[5] Information from CI-1 detailed below, indicates that Olds owed this money to Harvester. After the robbery, Kenyounta Harvester took possession of Olds's 1998 Buick Riviera. On October 24, 2004, Affiant observed Olds's Buick parked behind Marell's Barber Shop, located at 7251 W. Appleton Avenue. Affiant observed Kenyounta Harvester drive this vehicle from the barber shop to 4129 N. 84th Street, where he dropped off a passenger. Affiant then followed Kenyounta Harvester to his residence at 16755 W. Dane Court, Brookfield, Wisconsin, where he parked the vehicle in the garage.

105.    On December 17, 2004, Kevin Johnson was arrested for possession of with the intent to deliver cocaine base, unlawful possession of a firearm by a felon, and bail jumping. Johnson was driving the same vehicle – a Ford Bronco – that officers had attempted to follow on October 18, 2004. Officers searched the vehicle and located an electrically activated trap compartment inside the steering wheel. Secreted in the compartment was a loaded Glock .40 caliber pistol, two 1/8-ounce quantities of crack cocaine, almost $3000, and a black knit hat. Johnson had three cellular telephones. After the arrest, an officer observed that one of Johnson's phones received an incoming text message from "Drawzz (Nathaniel Johnson) informing Kevin Johnson that "Fly [Kenyounta Harvester] says chirp[6] him."

106.    While Kevin Johnson was in-custody at the Milwaukee County Jail, Affiant reviewed a recorded telephone call between Johnson to Kenyounta Harvester, during which they discussed the contents of the steering wheel trap compartment. Johnson told to Kenyounta Harvester that he was in the middle of making money pick-ups when the police stopped him.

---

[5] As explained above, CI-1 states that Body actually stole about a ½ kilogram of cocaine (which would have been worth around $10,000-12,000).
[6] "Chirp" is a slang term meaning to call someone using the walkie-talkie or direct-connect feature of a cellular phone.

33

Affiant also monitored a call in which Johnson said that he had the $30,000 necessary to bail himself out, but was concerned it would be seized by the police because it was dirty money.

107. On February 28, 2005, officers from the Brown Deer Police Department investigated a fire in an apartment building located at 8250 N. 46th St., Apt. 106, Brown Deer, WI.[7] Investigators discovered that the fire apparently was accidentally started while one or more persons were processing cocaine. Officers recovered two glass baking trays: one contained a rectangular brick of cocaine weighing approximately 1.5 pounds; the other contained a few ounces of cocaine that appeared to be peanut sized chips broken off of another brick of cocaine. Officers also recovered other smaller amounts of cocaine, and numerous other items indicative of drug trafficking, including mixing bowls with cocaine residue, a metal press, large jugs of Acetone, vacuum packaging plastic roll, bottles of Inositol powder, drug packaging materials, and a loaded Glock .45 caliber pistol. According to an ATF trace report, Angela Bissonnette originally purchased this gun from Badger Guns & Ammo in Milwaukee County.

108. The building's management had records showing that Bettye A. Berry (B/F, DOB: 01/26/48) rented this apartment. Berry is the mother of Bridgett Groshek, who appears to be the aunt of Nina Simmons. At the time Berry applied to rent the apartment, she produced a State of Alabama identification. Following the fire, Berry had no contact with management, effectively abandoning the apartment without concern for her security deposit, and personal property. Officers contacted persons in Alabama claiming to have family relation to Berry, but have not been able to contact her.

109. On March 3, 2005, Affiant observed Nina Simmons and Bridget Groshek leaving

---

[7] Brown Deer is a community on the north side of Milwaukee County.

34

8250 N. 93rd Street, one of numerous properties rented in Simmons's name and believed to be used for drug trafficking activities. Simmons and Groshek entered a blue 2000 Chevrolet Impala four-door, Wisconsin plate UZJ839. The vehicle listed to Maddie Turner, the brother of Lance Reed. But Affiant knows that this is actually Lance Reed's vehicle.[8] The vehicle registration was expired, and Affiant arrested Simmons for obstructing an officer and having a suspended driver's license. Affiant confiscated $2,912 cash from Simmons's person, who had no explanation for the money. Simmons had two cell phones, including a cell phone with a number known to be used by Kenyounta Harvester at the time, (414) 737-2618, as well as a cell phone with no phone book or names, only unlabeled direct-connect numbers. Simmons denied coming out of 8250 N. 93rd Street, and denied knowing Kenyounta Harvester, although she had a tattoo, "Ken," on her arm. After her arrest, Simmons moved and changed telephone numbers.

110.    On March 4, 2005, a citizen reported being the victim of an armed robbery occurring at 8860A N. 95th Street. The citizen alleged that she was tied-up by the suspects while they removed valuables from her residence. Affiant received a tip from a confidential informant, indicating that Kenyounta Harvester committed this robbery with another unknown subject. Investigation revealed that the citizen is the mother of two children fathered by Charlie Body. The robbery appeared to be in retaliation for the October 2004 incident described above where Body robbed Toya Olds of money of cocaine belonging to Kenyounta Harvester. The citizen identified Kenyounta Harvester through photographs as one of the two men who robbed her. The investigation of this case is continuing.

111.    On March 24, 2005, Affiant received and verified a tip that Kenyounta Harvester

---

[8] The vehicle was in fact subsequently re-registered to Lance Reed.

was using apartment #1 at 7964 N. 107th Street. Affiant observed Kenyounta Harvester leave the apartment and enter a black Chevy Malibu, which was rented from Enterprise Rent-A-Car, and drive away. Harvester was stopped and arrested for the armed robbery on March 4, 2005. He was found to be carrying three cell phones.[9] According to Enterprise management, Chantel Lockett of 8573 N. 106th Street, had rented this vehicle. Affiant also observed Angela Bissonnette leave the same apartment and get into a gold Chevy Malibu, also rented Enterprise Rent-A-Car. According to Enterprise management, Nina Simmons had rented this vehicle.

112. While in custody, Kenyounta Harvester gave a statement denying involvement in this robbery. He claimed Angela Bissonnette was an alibi witness, and volunteered to participate in a line-up if necessary.

113. On March 28, 2005, Affiant was informed by the Milwaukee County Sheriff's Department that Kenyounta Harvester was to be released from the Milwaukee Jail on $25,250 bail. Affiant obtained photocopies of the checks and bail forms. There were a total of five checks used to post bail: two M&I Bank cashier's checks with Harvester's law firm listed as remitter (one for $10,000 and one for $250); one TCF National Bank cashier's check from "Maddie Turner" for $5000; one Park Bank cashier's check from "William Turner" for $5000; one US Bank cashier's check from "Andrea Chavis" for $5000. The home address provided by Kenyounta Harvester was 4117 W. Congress St., which is a non-existent address.

114. On March 29, 2005, Affiant located Angela Bissonnette at the Hilton Garden Inn, 11600 W. Park Place, Milwaukee, Wisconsin. Affiant interviewed Bissonnette in an attempt to verify Kenyounta Harvester's alleged alibi for the March 4, 2005 robbery. Bissonnette could not

---

[9] Service to all three phones was discontinued following Kenyounta Harvester's arrest.

provide an alibi. Affiant noted that Bissonnette had two cellular phones which were attached to battery chargers, and sitting on top of their original packaging. Bissonnette claimed one phone to belonged to her and provided Affiant with a false number for it. After additional questioning, Bissonnette provided the correct number, which was verified at the scene. Affiant later attempted to contact Bissonnette at the number provided only to learn the number was disconnected on March 30, 2005.

115. On June 7, 2005, Affiant learned that Lance Reed's automobile (which lists to Maddie Turner, and was driven by Nina Simmons when she was arrested by Affiant), had received parking citations at, and was eventually towed from, the AmeriSuites Hotel, 11777 W. Silver Spring Drive. Affiant went to the AmeriSuites Hotel, and learned that the management suspected that Angela Bissonnette was using a hotel room to conduct drug transactions. Bissonnette had originally checked-in on April 12, 2005, and was still occupying a room. She has been paying $75 cash per day and had no specified checkout date. Bissonnette had already paid over $4000 in cash to the hotel. Bissonnette was also receiving numerous outside calls that were connected through the hotel's operator. Hotel employees identified Bissonnette through photographs. Employees also identified Kenyounta Harvester, through a photo, as a frequent visitor to Bissonnette's room. An employee suspected Kenyounta Harvester was also involved in drug activity because of conversations he/she overheard as Harvester was speaking on his cell phone in the lobby area.

116. After reviewing numerous photographs, employees also positively identified Dejuan E. Curry as another person they had seen with Bissonnette. They also tentatively identified two others: Marvin L. Thomas and William Turner. Agents saw a silver Dodge Durango, Wisconsin license plate 353FDD, parked at the southwest corner of the hotel. Records

37

check revealed that it listed to Enterprise Rent-A-Car, and had been rented by Marvin Thomas on June 3, 2005.

117. On June 9, 2005, Affiant's partner learned that Chantel Lockett had rented a green Toyota Camry with Wisconsin license plate WNW318.

118. On June 11, 2005, Affiant initiated surveillance of the AmeriSuites hotel. The rented Dodge Durango was still parked at the southwest corner of the hotel. Agents observed Bissonnette make two trips in the Durango from the hotel to Kenyounta Harvester's home address in Brookfield, Wisconsin. Detectives also observed Kenyounta Harvester driving the Toyota Camry rented by Lockett to the hotel. Joy Thomas was also observed driving a Mercury Villager minivan belonging to Chantel Lockett to and from the hotel.

119. Agents unsuccessfully attempted to follow Kenyounta Harvester when he left the hotel on this date, but were unable to safely follow Kenyounta Harvester as he was speeding, driving erratically, and engaging in counter surveillance maneuvers.

120. On July 11, 2005, Affiant arrested Joseph Johnson and Marquis Davis for carrying concealed weapons. Each had a loaded pistol in his pants pocket. $2,800 was seized. They were driving a Jeep Cherokee that had been rented by Marvin Thomas from Enterprise Rent-A-Car. During surveillance prior to the arrest, agents observed the vehicle briefly stop and Johnson and Davis get out of the vehicle in the 2600 block of N. 17th Street, Milwaukee, WI.

121. On July 12, 2005, CI-2 advised Affiant that Joseph Johnson and Marquis Davis had delivered a 4.5 ounce quantity of cocaine powder to Victor Thomas in the area of N. 17th and W. Center Streets, just prior to being arrested with guns.

122. On September 30, 2005, CI-3 agreed to attempt to re-establish a relationship with

38

Kenyounta Harvester. Under the surveillance of case agents, CI-3 entered Kenyounta Harvester's barbershop (Marell's) at 7251 W. Appleton Avenue, while wearing a recording device. Affiant videotaped CI-3 entering and leaving the barbershop. CI-3 made contact with a woman working there, who immediately contacted Kenyounta Harvester by telephone. Kenyounta Harvester spoke with CI-3 and asked for an immediate meeting at N. 76th Street and W. Mill Road. He provided CI-3 with cellular phone number (414) 364-1352. CI-3 agreed to the meeting. Case agents established surveillance, including videotaping, at the meet location. CI-3 placed a recorded call to Kenyounta Harvester at (414) 364-1352 to confirm the meeting.

123.    Harvester arrived for the meeting in a rented 2006 blue Dodge Magnum with Wisconsin plate 431JTL. It was later discovered that this vehicle was rented by Connie Johnson from Mayfair Rent-A-Car, Inc. Harvester was the front passenger and was accompanied by two other black males. These two black males appeared to stand guard while Harvester spoke with CI-3. Harvester discussed his prior relationship with CI-3 and their mutual relationship with "Danny" (the murdered former cocaine supplier) from Chicago. Harvester said that police had seized his black car because they found the "stash." (Based upon training and experience, Affiant knows this means a hidden trap compartment). Harvester said he had a lot of work for CI-3 to do, including putting "stashes" in five cars. Harvester said his birthday was yesterday (September 29) and showed a watch he claimed was a $52,000 Rolex. Harvester said his good telephone number is (414) 364-1352, but said that it will be cut off in a couple of days and provides CI-3 a new number of (414) 736-3871.

124.    Harvester said he needed "stashes" put in three cars right away, and said he would call CI-3 in about a week. Harvester said he needed that "stash" for a gun and "stuff", and wanted a "stash" put into a Yukon that will hold 30-40 "pigeons." (Based upon training and

39

experience, Affiant knows this means hidden compartment that will hold 30-40 kilograms of cocaine.) The entire meeting was captured by the recording device.

125. On October 13, 2005, a MPD Officer stopped a 2005 Chrysler Pacifica, Wisconsin license plate 835ECV, in the 4400 block of N. Sherman Boulevard for speeding. This vehicle had been rented by Connie Johnson from Mayfair Rent-A-Car. Johnson had traded in the Dodge Magnum Wisconsin license plate 431JTL, which case agents observed Kenyounta Harvester riding in during the September 30, 2005.

126. Marquis D. Davis was arrested for the traffic violations and on an outstanding warrant. Kenyounta Harvester was a passenger. A second, unidentified passenger fled on foot, abandoning 10.57 grams of cocaine base.

127. On November 1, 2005, CI-3 went to Marell's barbershop and asked an unknown black female to contact Kenyounta Harvester. She did and CI-3 spoke to him on phone. Kenyounta Harvester arranged to meet with CI-3 to continue negotiations regarding the installation of trap compartments.

128. Kenyounta Harvester, along with three unknown black males, arrived in the 5500 block of N. Lover's Lane, in a black 2005 GMC Yukon, Wisconsin plate 109JPY, which was rented from Enterprise Rent-A-Car by Andrea Chavis. Harvester and two of his associates were armed with handguns. Harvester ordered CI-3 to follow the Yukon to 1518/1520 N. 34th Street. Harvester and CI-3 talked at length about installing traps in Harvester's vehicles, specifically discussing placing traps in a Dodge minivan and Chevrolet Tahoe. [It should be noted that one of daycare centers controlled by the organization have a Dodge minivan and just the week earlier than the meeting, Nina Simmons registered a 1995 Chevrolet Tahoe, Wisconsin plate 238KCM.]

129. During this meeting, Kenyounta Harvester had associates working counter-

40

surveillance on the block, looking for passing police officers. Harvester received frequent calls from these associates describing the occupants of passing vehicles and providing him with the location of marked police squad cars a few blocks away. Harvester told CI-3 that the work on installing the traps would take place in the basement of the Ebony III salon (where there is a carwash), located at 7526 W. Appleton Avenue. The listed owner of Ebony III is Maddie Turner, Sr., the father of William Turner and Lance Reed. William Turner runs the establishment day-to-day.

130.     On November 2, 2005, after learning that Andrea Chavis had rented the vehicle used by Kenyounta Harvester during his meeting with CI-3, agents conducted surveillance of Chavis at her workplace, U.S. Bank, 13195 W. Hampton Avenue. Agents observed Chavis leaving the business and get into a 1999 Toyota RAV4. Chavis was not using the rented Yukon.

131.     On November 17, 2005, CI-3 placed two consensually monitored and recorded telephone calls to Kenyounta Harvester. Harvester only answered the second call. CI-3 told Harvester that CI-3 was in Milwaukee and ready to work. Harvester stated that he wanted CI-3 to come see him in the morning. CI-3 agreed. Pen register trap and trace records confirm that these contacts between CI-3 and Harvester occurred.

132.     On November 18, 2005, CI-3 placed several consensually monitored and recorded telephone calls to Kenyounta Harvester, but the calls were not answered. At approximately 2:55 p.m. CI-3 placed another consensually monitored and recorded telephone call to Harvester. This time Harvester answered and told CI-3 he had to go pick up his children and would call CI-3 back at 3:40 p.m. Harvester did not call back, so CI-3 placed another consensually monitored and recorded telephone call to Harvester at 4:10 p.m. Harvester stated that he would call CI-3

41

back in a couple of seconds. Harvester did not call back, but an individual who identified himself as "Ken's little brother" did call back. The "little brother" stated that he would meet CI-3 at a Baymont Hotel on Silver Spring Drive, to give CI-3 money to pay for a room at the hotel. CI-3 stated that he was coming from the downtown area, and asked for directions to the hotel. The "little brother" gave CI-3 directions, and they agreed to meet. CI-3 eventually met an associate of Harvester (who could not be positively identified, but CI-3 reported that CI-3 had previously seen this individual with Harvester on September 30, 2005). The associate gave CI-3 $250, told CI-3 to check into the Baymont Hotel, and said Harvester would call CI-3 in the morning. Harvester did not call CI-3 on November 19, 2005.

133. On November 20, 2005, CI-3 placed a consensually monitored and recorded telephone call to Kenyounta Harvester. The call went to voice mail, and CI-3 left a message stating that CI-3 was still in Milwaukee, waiting for Harvester to give CI-3 a call, that CI-3 was willing to work on anything, "houses, cars, trucks, whatever you want me to do", and that CI-3 really needed to make money. (Based upon previous conversations with CI-3, Affiant knows CI-3 was telling Harvester that CI-3 was willing to install hidden trap compartments in Harvester's houses or vehicles.) At 1:10 p.m. that same day, agents contacted CI-3 to check to see if CI-3 had heard from Harvester. CI-3 stated that Harvester had just contacted CI-3 by telephone, and asked when CI-3 wanted to start working (Affiant knows that Harvester was referring to the installation of trap compartments based upon the previous discussions between CI-3 and Harvester). CI-3 stated CI-3 wanted to begin work immediately. Harvester stated he would contact CI-3 in approximately 30-45 minutes. Pen register and trap and trace records confirm this contact between CI-3 and Harvester; however, this call was neither monitored or recorded. At approximately 4:10 p.m. that same day, CI-3 contacted case agents. CI-3 stated that, at

42

approximately 4:05 p.m., CI-3 contacted Harvester. CI-3 stated that the first call went unanswered, and CI-3 did not leave a message. Pen register trap and trace records confirm this contact. CI-3 stated that, at approximately 4:06 p.m., CI-3 again called Harvester. CI-3 stated that Harvester answered this call. Harvester stated that he needed to get keys to the garage where CI-3 would be working on Harvester's vehicles. Harvester stated he would call CI-3 back in 30 minutes. CI-3 asked Harvester where he could put his tools so they would not be stolen. Harvester told CI-3 not to worry. Pen register trap and trace records confirm this contact between CI-3 and Harvester; however, this call was neither monitored or recorded. At approximately 6:10 p.m., CI-3 again contacted case agents. CI-3 stated that, at approximately 6:02 p.m., CI-3 called Harvester. Harvester told CI-3 that he needed to call the guy from the garage, and would call CI-3 back. Pen register trap and trace records confirm this contact; however, this call was neither monitored or recorded. Pen register trap and trace records indicate that Harvester did not attempt to contact CI-3 again on November 20, 2005.

134. On November 21, 2005, CI-3 placed a consensually monitored and recorded telephone call to Kenyounta Harvester. Harvester told CI-3 that CI-3 could work on Harvester's vehicles inside the garage at Harvester's residence. (Affiant knows based upon the prior conversations between CI-3 and Harvester that Harvester was referring to installing hidden trap compartments.) CI-3 asked if there was enough room inside Harvester's garage, and Harvester stated there was. Harvester stated he would contact CI-3 again between 1:00 and 1:30 p.m. Pen register trap and trace records confirm this contact between CI-3 and Harvester. At approximately 1:57 p.m., at the direction of case agents, CI-3 again made a consensually monitored and recorded call to Harvester. Two calls went to voice mail, and CI-3 did not leave a message. Harvester answered a third call, and told CI-3 that he would call CI-3 in a couple of

43

minutes. CI-3 implied that CI-3 would drive to the vicinity of Marell's Barbershop (which Affiant knows is located at 7251 W. Appleton Avenue and is affiliated with Harvester's organization) and wait. Harvester told CI-3 "Don't hang around the barber shop, okay?" CI-3 agreed. Pen register trap and trace records confirm these contacts. At approximately 2:20 p.m., surveillance was established in the vicinity of the 7200 block of W. Appleton Avenue. At the direction of case agents, CI-3 continued to make attempts at contacting Harvester, leaving several messages in which CI-3 stated that CI-3 was in the area. Pen register trap and trace records confirm these contacts. At 4:21 p.m., at the direction of case agents, CI-3 continued to make attempts at contacting Harvester, without success. Harvester never contacted CI-3 and surveillance was terminated. Pen register trap and trace records confirm these contacts.

135.    On November 23, 2005, Affiant interviewed the owner of 1120/1122 N. 119th Street (a duplex). 1120 N. 119th Street was then being rented by Nina Simmons. Agents received information that Simmons paid rent, but that no one was actually living in the apartment. In addition, the owner stated that Simmons frequently changed her cellular telephone numbers. The first number provided by Simmons in March 2005 was (414) 690-7195. In June 2005, Simmons switched to (414) 378-9580. As of November 8, 2005, Simmons was using (414) 530-5376. Both of the first two numbers appeared on Kenyounta Harvester's call log from his former cellular number (414) 364-1352.

136.    On November 23, 2005, Affiant interviewed Andrea Chavis at The Phoenix, a nightclub attached to the Diamond Inn, 6222 W. Fond Du Lac Avenue. Chavis manages The Phoenix and claimed to be the owner. Her name is on the liquor license. Affiant noted Chavis's 1999 Toyota RAV4 outside. Chavis admitted that she knew Kenyounta Harvester and had

44

posted $5,000 of his bail in March 2005. She provided false information regarding her home address and employment, as well as the source of the $5,000 used to post Harvester's bail. She stated the $5,000 was from a credit card cash advance, when in fact bank records show she took the money directly out of a $10,000 savings account.

137.     On January 31, 2006, Indiana State Police stopped an overdue rental car in which Brandon Bennett, Marquis Davis, Joseph Johnson, Ken Glenn, and an unidentified fifth passenger were driving. Bennett was arrested for operating without a license; Davis was arrested for possession of marijuana. Indiana State Police subsequently obtained consent from the rental car company and conducted a search of the vehicle. Inside, officers found two firearms. No one has been charged in this case yet.

138.     From February 4 through February 6, 2006, Harvester and a number of associates traveled to Detroit to attend the Super Bowl.

139.     From February 17 through February 21, 2006, Harvester was in Houston with numerous associates for the NBA All-Star game.

140.     On March 2, 2006, at approximately 3:00 p.m., agents began surveillance on the residence of Nina Simmons's at 6580 North 73rd Street. The previous day, agents had observed Simmons purchase packaging materials consistent with those used to repackage cocaine for distribution at a local Wal-Mart before entering the residence using keys. On March 2, agents observed Simmons exit the residence, enter a Chevy Tahoe 238-KCM, then drive and park approximately one block away. Simmons had previously been observed driving this vehicle in December, 2005, and on March 1, 2006, and the vehicle is registered in her name. When agents drove by her vehicle, she was no longer inside. On March 2, 2006, the resident in the lower unit

45

(6578 N. 73rd Street) at Nina Simmons's residence confirmed that Nina Simmons in fact resides at 6580 N. 73rd Street.

141. At approximately 6:30 p.m., a black GMC Yukon with Wisconsin temporary plates pulled into the driveway at 6580 N. 73rd, and parked in the driveway. The Yukon had previously been observed at the home of Larry Harvester and Joy Thomas at 10892 West Donna Court and at the home of Kenyounta Harvester at 16755 West Dane Court, Brookfield, Wisconsin. The Yukon was followed by a black Chevy Trailblazer with temporary Indiana tag I409104, which parked at the end of the driveway near the backyard. Agents then observed two unidentified Hispanic males from the Trailblazer enter the side door of the home, followed by an unidentified black male. As established in Detective Huston's affidavits, agents had previously determined that Kenyounta Harvester's source of cocaine was located in Chicago, Illinois near the border of Indiana.

142. After a short period of time, the Yukon drove away, and the Trailblazer was no longer seen, and had possibly entered the garage at N. 73rd Street. Simmons vehicle had also returned to her residence.

143. Agents then saw a white Dodge Caravan parked in the area of 74th and Acadia. This white Caravan has had a GPS tracker on it throughout the period of the wiretap. Based upon the traffic pattern observed for the Caravan, it appears to be used for delivering drugs and picking up money. The Caravan makes trips to various locations associated with Harvester throughout the city; conducts frequent counter-surveillance moves such as stopping, making multiple turns and u-turns; drives indirect routes between destinations; and has been observed on four occasions meeting other individuals and vehicles at a Walgreen's located on N.76th Street, just north of Mill Road.

144. Simmons was observed driving into the area of 74th Street and Acadia and parking her Tahoe next to the Caravan. A passenger in that Caravan, later identified as Joe Johnson, exited

46

and entered Simmons' Tahoe. Approximately 15-20 seconds later, Johnson exited Simmons' vehicle and reentered the Caravan. Johnson was observed carrying a bag.

145. Simmons then drove westbound, while the Caravan headed north on 74th Street. Officers then attempted a traffic stop of the Caravan at approximately 60th Street and Silver Spring. After a short pursuit, Joe Johnson exited the Caravan and fled on foot. Agents in pursuit of Johnson observed him jump a fence and throw down what was later found to be two kilograms of suspected powder cocaine. The cocaine was packaged in plastic bags with blue tape that was consistent with what agents saw Nina Simmons purchase from Wal-Mart on the evening of March 1, 2006. A broadcast was issued over the police radio band indicating that two kilograms of cocaine had been recovered from a passenger in the Caravan.

146. Agents then located and stopped the black Trailblazer with Indiana temporary tags on N. 76th Street, just north of Good Hope Road. A certified drug detecting canine was brought to the Trailblazer and alerted for the presence of cocaine. Two Hispanic males were taken into custody, and have been identified as Rafael Rodriguez and Raul Aguirre-Alvarado A subsequent search of the Trailblazer uncovered over $200,000 in cash secreted in a trap compartment in the front driver's side dash board. Based upon information acquired from confidential informants detailed in Detective Huston's January 30, 2006 affidavit, case agents know that Harvester's suppliers regularly utilize trap compartments to secret drugs and money; that Harvester generally has his drugs transported from his supplier to him in Milwaukee; and Harvester generally receives drugs on consignment and then pays for the previous shipment when he receives his new shipment.

147. Agents located Nina Simmons's Tahoe driving on N. 76th Street. When they attempted to stop her, she led approximately 12 police cars on a high speed chase which lasted approximately 5 minutes. Simmons eventually pulled the Tahoe into a gas station located at N. 76th

Street and W. Bradley Road. Nina Simmons and Larry Harvester, who was the only passenger, were arrested.

148.     Police subsequently drove to 16755 Dane Court in Brookfield, WI, which has been identified through surveillance and confidential informant information as the home of Kenyounta and Chantel Harvester. Once at Dane Court, they observed Chatel Harvester arrive in a silver BMW X5 SUV, which is registered in Chantel Harvester's name. Bank records confirm that Chantel Harvester also pays the monthly payments on the vehicle through a bank account for Sally's Little Angels Day Care, which she owns. Upon seeing officers in front of her residence Chantel Harvester slowed down, then gunned her engine and drove to the end of the street, which is a cul-de-sac. She drove into a neighbor's driveway and officers followed. She then attempted to back out of the drive way, but was blocked in by police. Chantel Harvester was then removed from the vehicle and taken back to her home.

149.     Once inside her home, Chantel Harvester informed agents that there was a loaded handgun in the residence. She directed agents to the location of the gun and requested that agents remove it from the house. As is established in Brett Huston's January 30, 2006 affidavit, Harvester is a multiple time felon. Agents did in fact recover a Glock .40 caliber handgun from a bedroom. In the bedroom, in plain view, agents observed in excess of $200,000 in jewelry, including a diamond encrusted Jacobs watch and a diamond encrusted dog tag which was the size of a man's hand. Chantel Harvester initially consented to a search of the residence, but then revoked consent when agents attempted to confirm that she was in fact consenting to a search, before they actually searched the residence.

150.     Officers went to 10892 W. Donna Court, which is the residence of Joy Thomas and Larry Harvester. Joy Thomas signed a written consent to search her residence. Officers located

48

Smith & Wesson 9 mm handgun, identification cards for Kenyounta Harvester and Larry Harvester, and approximately $22,000.

151. Officers also went to 6018 N. 64th Street, apartment #8, which is the residence of Karen Lemon and Marquis Davis. Ms. Lemon gave written consent to search her residence. Inside, officers located a Black & Decker heat sealer, four boxes of sealable plastic bags, a .40 caliber handgun, a bullet proof vest, approximately one ounce of suspected marijuana, a digital scale with white residue, glass beakers with white residue, and a plastic bag with a white powdery substance. Ms. Lemon confirmed that she had seen Marquis Davis with Joseph Johnson at the residence earlier in he evening of March 2.

152 Pursuant to a search warrant issued by the Honorable Aaron E. Goodtstein on March 3, 2006, agents searched 6580 N. 73rd Street, which is Nina Simmons residence. In the kitchen they found Black and Decker Food saver heat sealer; two rolls of plastic; four freezer bags; one unopened jar Inositol, which is a common cutting agent used to expand the volume of cocaine; one box of latex gloves; two roles of duct tape; and a plastic bag containing several kilogram wrappers. In the living room they found a loaded .40 Glock firearm, two identifiers for Nina Simmons, and two cellular telephones.

153. Pursuant to a search warrant issued by the Honorable Aaron E. Goodtstein on March 3, 2006, police searched 16755 W.Dane Court, Brookfield, WI, which is the residence of Kenyounta and Chantel Harvester. In addition to the firearm seized late on March 2 at the request of Chantel Harvester, agents found a Jacobs watch valued at approximately $100,000, and two diamond encrusted necklaces valued at $100,000.

**CONCLUSIONS**

154. I believe that this affidavit establishes probable cause to believe that the

49

target individuals identified above have been involved in a conspiracy that has been distributing large quantities of cocaine in the Milwaukee area since at least 2003, and that the conspiracy continues to do so at the present time. This information also establishes probable cause to believe that above-identified target individuals have earned a large amount of money as a result of their drug trafficking activities, which they have likely invested in assets, including real property, jewelry, and vehicles.